## Case No. 11,431.

PRINCESS OF ORANGE, Jewels Stolen from The.

[N. Y. Comm. Adv. Dec. 13, 1831.]

District Court, S. D. New York. 1831.

REMISSION OF FORFEITURE—ILLEGAL IMPORTATION—POWER OF COLLECTOR—GOODS STOLEN FROM FRIENDLY SOVEREIGN.

[1. Although a collector of customs has no control of a prosecution for the forfeiture of goods illegally imported, yet when the United States takes steps to remit the forfeiture he may, under Act March 3, 1797 (1 Stat. 506), show cause against the remission.]

[Cited in U. S. v. One Case of Silk, Case No. 15,925.]

[2. In a proceeding for the remission of a forfeiture under Act March 3, 1797, the judge has jurisdiction to determine whether the case presented to him falls within the statute.]

[3. A United States district attorney may, upon the authorization of the government, appear in behalf of a person seeking the remission of a forfeiture under Act March 3, 1797 (1 Stat. 506).]

[4. A proceeding under Act March 3, 1797, for the remission of a forfeiture, cannot be maintained until the forfeiture suit has proceeded to judgment.]

[5. Property stolen from a friendly foreign sovereign, and smuggled into the United States, is not subject to forfeiture for illegal importation.]

[Proceeding on behalf of his majesty, the King of the Netherlands, for the remission of a forfeiture of certain jewels, the property of the Princess of Orange, alleged to have been illegally imported into the United States. Heard on objections to the jurisdiction.]

BETTS, District Judge. In the month of July last, the collector seized a large and valuable quantity of diamonds and jewelry, as having been smuggled into this port, in violation of the revenue laws. He directed the district attorney to prosecute the goods for condemnation; and shortly after, pursuant to that direction, a libel of information was filed against them, and they were attached by the marshal. The suit is now pending in the district court. The diamonds were smuggled by a person of the name of Polari, and a female who passed as his wife. A petition is now presented to me, praying me to inquire into the circumstances of the case, and to cause the facts appearing upon such inquiry to be stated and annexed to the petition, and to direct their transmission to the secretary of the treasury of the United States, to the end that he may direct the forfeiture alleged to have been incurred to be wholly remitted, and the prosecution instituted for the recovery thereof to cease and be discontinued; and to direct the said jewels so seized and presented to be delivered forthwith to his excellency, Le Chevalier Bangeman Huygens, envoy extraordinary and minister plenipotentiary of his Majesty, the King of the Netherlands. The petition is headed: "The Petition of James A. Hamilton, District Attorney of the United States for the Southern District of New York, on behalf of His Majesty, the King of the Netherlands, presented pursuant to instructions from the Secretary of the Treasury, at the request of the Commander Benjamin Huygens, Envoy Extraordinary and Minister Plenipotentiary of His Netherlands Majesty;", and it is subscribed, "James A. Hamilton, District Attorney of the United States, on Behalf of His Majesty, the King of the Netherlands." Notice of the petition is addressed by the district attorney to the collector, and a written admission of its service is subscribed by the collector. The petition represents: That one Polari, accompanied by an unmarried woman by the name of Blanche, arrived in this port in the month of June last, from Havre. That they brought with them, concealed about their persons, and in a walking cane and umbrella handle, a large quantity of jewels, which they landed without having entered or paid or secured the duties, and without a permit; and that by the law, the jewels were subject to the payment of duties. That the collector, having obtained information of the illicit importation, on the 28th of July last seized the jewels, and on the 30th of July, pursuant to the provisions of the 89th section of the revenue law [1 Stat. 695], directed an action to be brought against the jewels, in order to condemn the same as forfeited, under the 68th section of the same act; though the collector was previously informed by the Chevalier Huygens that the jewels were the same which had been stolen from the palace of the Prince of Orange. That the said jewels, in the possession of the said Polari, and considered as his property, were, in consequence of such illegal landing, subject to for-

feiture to the use of the United States, and would, as his property, be so adjudged. But the petition avers that the goods ought not to be condemned or prosecuted as forfeited on account of the alleged illicit and fraudulent importation and landing of the said jewels by the said Polari, but that the same ought to be given up to the petitioner: First, because the said jewels, having been stolen, were without the consent of the owner thereof, imported or introduced into the United States, and consequently there was not on the part of the owner of the said jewels any intention to violate the laws of the United States; and next because the said jewels being the property of his majesty, the King of the Netherlands, "the well-settled principles of the laws of the nations that the property of one sovereign is not permitted to be seized within the dominions of another, and subjected to judicial decision, applies in this case, and they must be released." The petition then proceeds to detail the circumstances connected with the theft; the conduct of Polari in this country; the proceedings of the informer; of the Chevalier Huygens and the collector, after information was obtained; but it is not important to the present investigation to recapitulate those particulars.

Upon reading the petition the district attorney moves that the judge now proceed to take proofs summarily in support of it, in pursuance of the act of congress of March 3, 1797 [1 Stat. 506]. The collector appears in person and by counsel, and objects to the judge receiving the petition, because it is not presented by a party authorized by the act of congress to claim this procedure, and because no case is made by the petition of which the judge can take cognizance. On the other hand, the district attorney insists that the judge acts in behalf only in a ministerial capacity; his duty being merely to collect and report evidence; and that he is not empowered to adjudge whether the case or the parties are those contemplated by the act. Those matters must be referred to the decision of the secretary of the treasury. He furthermore contends that the collector is not authorized to counteract or control any proceedings taken in behalf of the United States. He insists that after suit brought the interests and rights of the collector are merged in those of the United States, and are subject to the discretion of the government, whether it may choose to abandon or enforce the prosecution. The latter position is no doubt substantially correct. The collector can assume no control in the management of the prosecution. The government may discontinue the suit, or remit the forfeiture without any reference to him; and whatever his interests may be in the subject matter, they are submitted to the discretion of the government, and are lost when those of the United States are relinquished or defeated. This has been distinctly adjudged by the supreme court. U. S. v. Morris, 10 Wheat. [23 U. S.] 246.

But although the control of the prosecution is absolutely in the United States, yet the act of March 3, 1797, expressly requires that the party claiming the forfeiture shall have notice of any application for its remission, that he may have an opportunity of showing cause against such remission. The collector has received such notice in this case, and as such party he is entitled to appear and make all legal objections to the application, whether it is presented by the United States or an individual.

Neither can I accede to the other proposition of the district attorney, that the judge acts solely in a ministerial capacity in taking the proceedings required by this act. He does so undoubtedly in reporting the facts after ascertaining what the facts are, because he is not authorized by the act to express any opinion upon their sufficiency or effect; but he takes the proofs judicially, and must accordingly decide upon the competency and pertinency of the proofs offered (U. S. v. Hayward [Case No. 15,336]), and it must, as a necessary incident to the duty required of him by the act, devolve upon him to decide whether or no a case exists of which he can take cognizance.

It can hardly be maintained that a judge is obliged to collect proofs upon any petition of any party who may choose to exact that service of him, without being allowed to determine whether the law enjoins the duty upon him. On the contrary, the first duty of the judge is to compare the case presented to his consideration with the statute, and adjudge whether it is such an one as to call those special powers into exercise. If not, he must refuse to act upon it. The district attorney invokes the interposition of the judge in this case, under the provisions of the act of March 3, 1797. If that act does not supply authority for these proceedings, there is no pretence that they can be maintained.

Judge Story says the government can only remit a forfeiture upon a statement of facts furnished in the manner prescribed by the statute (The Margaretta [Case No. 9,072]), and if the powers of government over their own claims is not broad enough without the aid of the act to effect a relinquishment of demands they have in suit, it surely would not be supposed that any assistance could be derived from the acts of a judge out of court, further than those acts are required and supported by the express provisions of the statute. Is this petition, then, such as is required by the act? Under this inquiry, the objection to the competency of the district attorney to act in behalf of the petitioner comes properly under consideration. I do not accede to the construction of this act which limits the right of petitioning to the party in person, who has incurred a forfeiture, or whose property may be subject to forfeiture. He may constitute his proxy or attorney in fact, to act for him in this behalf. Nor do I undertake to declare that there is any incompatibility or impro-

priety in a district attorney appearing as such attorney in fact, in support of a petition seeking the remission of a forfeiture, after the forfeiture has been decreed or admitted. When the question of forfeiture is determined, his official services would terminate, and where there is no interference with his public duties, I should never be inclined to multiply inconvenient restraints upon the exercise of his professional talents in behalf of individuals. If, then, the objection rested only upon this point of form, I should be disposed to consider the official appellation employed in the petition as a descriptio personae merely, and, disregarding it as surplusage, accept the petition as presented by an attorney in fact, in behalf of his principal.

There is undoubtedly no little difficulty in sustaining this view of the case upon the evidence introduced by the district attorney in support of his right to present the petition. He acts under the explicit directions of the secretary of the treasury, and as a public officer. By a letter of the 6th of October, the secretary directs him "to file a suggestion with the court, stating those jewels to be the property of the Prince or Princess of Orange," and, without admitting the validity of the claim, to use the same zeal and diligence in sustaining it before the court as if it were a claim of the United States. By a subsequent letter of the 12th of November, the secretary requests him to "take charge of the Chevalier Huygens' application for a remission of the forfeiture, and conduct the proceedings on his behalf as he had been instructed to do in regard to the suggestion which was intended to have been filed." So the petition states that it is presented pursuant to instructions from the secretary of the treasury at the request of Chevalier Huygens, &c.

The understanding of the district attorney seems to be. and such is the bearing of these documents, that he does not act in his individual capacity for the King of the Netherlands or the Chevalier Huygens, but in his official character in behalf of the United States to support the claims of the King of the Netherlands. If such is the fact, it tends to complicate and embarrass the case, rather than free it from difficulty. In so far as the district attorney represents the government in this matter, the petition is the same in effect as if presented in the name and on the part of the United States. Not to animadvert upon the incongruity of the United States appearing to solicit for themselves a remission of a forfeiture, it is enough to say that most manifestly they are not a party who can, in any way, become petitioners, under the provisions of that act. There is not a clause of it which could be made applicable to them. They can never incur a forfeiture, nor can any property in which they are interested be subject to forfeiture under their own laws. If the United States, acting through their public officer, were soliciting this remission, there would be, in my opinion, an insuperable defect of parties. This,

however, does not appear to me to be the character of the application. The letter of the secretary of the treasury, taken together, rather imports that the government will remain neutral between the petitioners and the officers of the customs. Probably, then, the government mean no more than withholding their own authority and interposition, to lend to the petitioner the aid and advantage of the official character of the district attorney in the management of the business. Nor do I feel it incumbent on me, on this application out of court, to pronounce on the rights or disabilities of the district attorney in respect to his official acts, further than shall be indispensably necessary in reference to the subject before me.

A different duty might be imposed upon me if this was the trial of an issue in court, in which the district attorney appeared under the direction of the government to support a claim hostile to that in prosecution in the name of the United States. But considering the directions of the government to this officer as a permission and request to appear and conduct this case for the King of the Netherlands. alone, and that the king is the actual party petitioning through the district attorney, and that the district attorney is performing no function appertaining to his office, I am not disposed to declare it incompetent for him to perform that duty. The authorization of government may have been desired as an excuse for a course of proceeding not in strict conformity with the duties assigned him by statute. Disconnecting then the United States from the proceedings, and understanding them to be solely in favor of the King of the Netherlands. I shall hold that using his official designation of office will not disqualify the district attorney from presenting the petition, and conducting the application. He will still be regarded as in effect acting in his individual capacity.

The motives leading the government to interfere in this matter, as manifested in the correspondence before me, are of a character the most liberal and courteous towards the King of the Netherlands—a friendly power. A strong anxiety is exhibited, not only to remove every obstacle of a technical character which might impede the manifestation of the rights of the king, but to aid him in the prosecution of these rights by supplying him every facility consistent with the authority and character of our laws. I should certainly endeavor to interpose no obstacles to the fulfillment of purposes so honorable and commendable, but should wish rather to advance them by every means compatible with the duties of the place I hold. Thinking myself justified by the spirit of the act, I shall make the most indulgent allowances in respect to all matters of form, and shall accordingly hold that the petition is presented by a competent party, and so as if sufficient in point of substance, that the proof offered may be taken under it. A more extended considera-

tion has been bestowed upon this branch of the case, because it does not stand free of all embarrassment, and because it seems to have been the point upon which the greatest stress has been laid in opposition to the petition. I certainly feel bound to say that whatever my opinion may be upon the strict propriety of calling upon the district attorney in his official character to support and manage this matter, his own conduct has been without exception. He has proceeded in the business in a manner perfectly open, fair, and liberal, and with a manifest disposition to do no more than his obligation as an officer of government required at his hands.

The main question now arises upon the merits, whether the petition makes out a case of which the judge can take jurisdiction. (The act "To provide for mitigating or remitting the forfeitures, penalties and disabilities, accruing in certain cases therein mentioned," passed March 3, 1797, being chapter 361 of the Acts of the Fourth Congress, is here cited.) The practice under this act, since I have presided here, has invariably been to require two particulars to be established preliminarily to taking cognizance of a petition: (1) That the petitioner is interested in the subject claimed as forfeited, &c. This matter is sufficiently shown upon the petition now before me. (2) That a case of forfeiture, &c., &c., actually exists. This must appear by sentence of condemnation actually passed upon the subject matter; or by the distinct, unequivocal admission of the party intervening by petition. Not only the title and manifest scope of the act have reference to cases of actual forfeiture, but it appears to me its terms can only be satisfied by applying them to the case of property condemned, or in a predicament where a condemnation on trial must be inevitable. The expressions in the statute seem to have been studiously employed to denote that a person or his property had become charged and fixed with penalty, forfeiture, &c. How does one incur a disability? Not by being exposed to that prejudice; not by being so placed that it may chance to befall him, but according to the plain and incontrovertible import of language, by being already in the condition the supposed disability would produce. The expression carries a like signification in reference to the other terms "penalty," "forfeiture."

Neither in legal phrase, nor common parlance, is the word "incur" used to signify an inchoate or incomplete condition. It has reference to a state of things already passed and fulfilled. To incur a debt, or incur a responsibility, or incur loss, &c., is to have become absolutely liable in that behalf. So also the expression "subject to," when applied to seizure, forfeiture, disability, &c., is never found to mean only a probable or contingent liability. It imports that the penalty, &c., is actually affixed to and charged upon the party. When the revenue laws speak of com-

modities subject to duties, there can be no doubt of the intention of congress to declare the duty to be conclusively and inseparably attached to the article. The strongest expression in the law to denote property to be fixed with an incumbrance would be to represent it as subject to any particular claim or duty. The same remarks apply to the other term used by congress, "accrued." "Such fine, penalty, forfeiture, or disability shall have accrued," is a form of expression only adapted to convey the meaning that the fine, &c., was no longer a matter of question or uncertainty, but had become definitely fixed.

In ordinary acceptation, a debt cannot be said to accrue except when the right to demand it upon the one side and the liability to pay upon the other have become perfect. So in pleading, when the right of action is not consummate at the time of promise, the statute of limitation can only be alleged to bar from the right to sue accrued,—"actio non commuit"; because the party did not pursue his remedy within the period limited after he was fully entitled to enforce it. So in mercantile language, profits are said to accrue, not, certainly, when the adventure is instituted, but after the results are realised. The subsequent expressions in the act are of the same character. When the duty of the secretary of the treasury is designated, he is empowered to remit the fine, &c., "remove the disability," importing very distinctly that without such interference, to remit, the fine, &c. must be paid, and unless he remove it, the disability must be borne. This interpretation of the act, which renders the exercise of the powers conferred upon the secretary necessary only when an absolute loss must be sustained without such relief, secures to it its character of an act of grace, and harmonizes its provisions with those of existing laws. It could be required for no other purpose. Where the party has a defense sufficient to protect himself, or property on trial, there could be no occasion to provide him the high relief supplied by the statute.

It can hardly be implied that congress intended to depart so entirely from the uniform course of legislation as to furnish a party an immunity from prosecution. There could be no justice or hardship in leaving the citizen to his legal defence when he possessed an adequate one. That could never have been the mischief under the previous laws which the act of 1797 was designed to remedy. The defect of the former law was that it afforded the party no means of protecting himself or property except by a strictly legal defence. Congress most liberally furnished by this act a further aid to him. When he is remediless at law, he can now present his equities to a proper tribunal, and have a relief commensurate to these equities. This, it seems to me, was the sole purpose of the statute. I can discover no legal reason for interpreting it as a power to intercept suits

and prevent trials at law. It appears to me impossible to maintain that a party can avail himself of the relief indicated by that act, upon the allegation that he had violated no law, and that his property was not liable to any forfeiture. On the contrary, my opinion is that the only foundation upon which the benefits of this act can be invoked is that the party is rendered subject to a penalty or his property to forfeiture. I do not find that there has been any express adjudication in exposition of this statute—but the courts seem to consider the construction now suggested as that demanded by the act.

The supreme court state that the secretary of the treasury has adopted such construction, and impliedly admits its correctness. U. S. v. Morris, 10 Wheat. [23 U. S.] 295. Judge Johnson, in assigning his reasons in that case, intimates that the strict interpretation of the act would forbid any application for remission until judgment of conviction or condemnation had passed. Id. 298, 300. He very distinctly asserts that the act requires the petitioner to confess he had not violated the law when he petitions previous to judgment. I adhere. therefore, to the construction I have always given this act, and the petitioner, if he applies before sentence of condemnation, must equivocally admit the fact of forfeiture in order to give either the judge or the secretary of the treasury jurisdiction of the matter. This the petition now before you fails to do. It guardedly states "that the jewels in the possession of Polari and considered as his property" were subjected to forfeiture, and that, "considered as his property," would be so adjudged. This, if accompanied by no restrictions or qualification, would be an exceedingly faint and vague admission of the fact of forfeiture. If made by Polari himself, it would hardly amount to such a concession of the facts as to justify a sentence of condemnation in court, or afford occasion to ask for a remission. It is not inconsistent with the entire immunity of the property. But when made by a third party who denies all right of property in Polari; who represents the possession of Polari as tortious and felonious, and asserts a full right of property in himself, it is no admission, nor anything in the character of one. Clearly it was not intended to be an admission which would bind the property, if the secretary of the treasury refused to remit this supposed forfeiture. For the next paragraph of the petition advances claims which utterly countervail the hypothetical admission, and show that the property could not be condemned as forfeited. It demands its immunity from forfeiture, and its restoration to the petitioner upon considerations of the highest and most cogent character. It avers that the property was stolen, and was introduced into this country without the consent and in violation of the rights of the owner; and it asserts that the property belongs to an independent and friendly sovereign, and that

the well settled principles of the law of nations do not permit it to be seized and subjected to judicial decision within the dominions of another sovereign power.

If the allegations of the petition are proved, no forfeiture has been incurred. The property must be acquitted on trial. The prosecution cannot be maintained against these facts. There can, therefore, be no occasion for the remitting power of the secretary. There would seem to be a gross incongruity in attempting to pardon or remit what was no offence. I am accordingly of opinion that this petition presents no case of which I can take cognizance.